THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                    No. 24-20552

                          Plaintiff,         Honorable Nancy G. Edmunds

     v.

Tribar Technologies, Inc.,

                          Defendant.

_____/

## Government's Sentencing Memorandum

The United States provides this memorandum in support of its position on sentencing.

## I.    Background

Tribar is a manufacturer of decorative trim assemblies and components serving the automotive and commercial vehicle markets, based in Southeast Michigan. (Tribar – About, https://www.tribar.com/about/) The facility where the events in this case occurred – Plant 5 – is a chrome plating facility in Wixom, Michigan, that uses an electroplating process to apply chrome finishing to plastic parts.

**A. Plant 5 Wastewater Treatment System**

The Plant 5 wastewater treatment system is a continuous process that treats wastewater from the chromium plating process, which includes spent chromium and nickel solution and process wastewater. Wastewater is sent at the end of production for pretreatment, which takes approximately 6-8 hours to complete before discharging into a sanitary sewer that runs to the Wixom Publicly-Owned Treatment Works (POTW). At Plant 5, wastewater is collected in holding tanks (Tanks A, B, T2 and T3) prior to being sent through the treatment system. Tanks A and B are the most relevant to this case. They are interconnected and each will overflow to the other when almost full. Chemicals may be added to holding tanks to facilitate treatment, but treatment does not typically happen in those tanks. The wastewater is sent from the holding tanks to a series of tanks for treatment including chrome reduction, copper and nickel precipitation, and pH adjustment. Finally, the wastewater is sent to a granulated activated carbon (GAC) system for treatment of per- and polyfluoroalkyl substances, and then to final discharge tanks. Before passing into the GAC, the system allows recirculation back to the beginning of the process for additional treatment if necessary. There are probes, alarms and other monitoring checks throughout the wastewater treatment system to alert operators to water quality conditions and processing issues.

During all times relevant to this case, Tribar held a Wastewater Discharge Permit, also referred to as an Industrial Pretreatment Program (IPP) Permit, issued by the Wixom WWTP effective April 15, 2022, authorizing discharges of wastewater from Plant 5 into the Wixom sewer system. Tribar's discharge point into the sewer is approximately 4.3 miles from the Wixom POTW treatment plant, and a discharge might take between 5 and14 hours to travel that distance. Tribar's IPP Permit included a notification requirement for batch discharges and prohibited Tribar from bypassing its own treatment system.

**B**.  **Events of July 23, 2022 – August 1, 2022**

Between at least some time in March 2022 and August 1, 2022, Tribar employed two operators on alternating 12-hour shifts to run its Plant 5 wastewater treatment system. An employee of the defendant (Employee A) worked the 12-hour shift from approximately 6:00 PM to 6:00 AM. Employee A typically worked alone with no on-site supervision. More than once in this same time period, another employee of the defendant found Employee A asleep in a car in the parking lot during Employee A's shift rather than inside Plant 5 operating Tribar's wastewater treatment system. Several times in this same time period, multiple employees of the defendant observed and informed other employees that Employee A smelled of alcohol while Employee A was working. Multiple employees notified management personnel at Plant 5 of Employee A's failure to perform wastewater treatment

operator job duties. Tribar took no action against Employee A before August 1, 2022, and allowed Employee A to continue working as a wastewater treatment operator at Plant 5 with no changes to Employee A's supervision, training, or job duties.

On or around July 23, 2022, Tribar Plant 5 accumulated approximately 15,000 gallons of untreated wastewater that contained high concentrations of hexavalent chromium. This wastewater had higher levels of pollutants than the wastewater typically generated from Plant 5 operations. During the week beginning Monday, July 25, 2022, employees at Plant 5 attempted to treat this wastewater in a holding tank to reduce the amount of hexavalent chromium before putting it into the Plant 5 wastewater treatment system. On Friday, July 29, 2022, the wastewater in the holding tank still contained high concentrations of hexavalent chromium and required more treatment before it could be transferred to Tribar's wastewater treatment system.

Starting on or around the evening of Friday, July 29, 2022, Employee A discharged approximately 10,000 gallons of insufficiently treated wastewater from the holding tank into the Plant 5 wastewater treatment system. Alarms in the wastewater treatment system were activated, indicating that the wastewater required further treatment before it could be discharged to the Wixom sanitary sewer system. Employee A disabled approximately 460 alarms and discharged the

4

wastewater to the Wixom sanitary sewer system which led to the Wixom POTW without completing the treatment necessary to remove chromium from the wastewater, as required under Tribar's IPP Permit.

Tribar did not report the discharge of untreated wastewater to Wixom until Monday, August 1, 2022, at approximately 12:23 PM. Tribar later claimed in a written document submitted to the Michigan Department of Environment, Great Lakes and Energy (EGLE) that it had reported the discharge to Wixom at 8:30 AM on August 1, 2022.

## II.   Offense Charged and Regulatory Programs

Tribar pleaded guilty to negligently discharging untreated wastewater into a POTW, a misdemeanor. 33 U.S.C. 1317(d) and 1319(c)(1)(A).

The Clean Water Act regulates and limits discharges of pollutants into Waters of the United States such as the Huron River and its tributary, Norton Creek. Discharges to Waters of the United States are generally prohibited except in accordance with a National Pollutant Discharge Elimination System (NPDES) permit. In many municipalities, industrial users discharge wastewater to the sanitary sewer system rather than directly to a waterbody. The sanitary sewer system conveys wastewater to the POTW, which then treats and discharges wastewater to a waterbody under the POTW's NPDES permit. Because POTWs cannot feasibly treat all industrial pollutants, the Clean Water Act establishes

pretreatment standards that limit the type and concentration of pollutants industrial users such as Tribar may discharge to the sewer system. As a part of their NPDES permits, POTWs must establish local sewer ordinances consistent with those pretreatment standards. These local sewer ordinances are federally enforceable under the Clean Water Act if the U.S. Environmental Protection Agency (EPA) or a state with delegated approval authority from the EPA has reviewed and approved them as a part of the POTW's pretreatment program.

EGLE is the Michigan state agency authorized by the EPA to approve local pretreatment programs. The Wixom POTW holds an NPDES permit issued by EGLE, which permits the Wixom POTW to discharge to Norton Creek, a tributary of the Huron River. Wixom also has an EGLE-approved Industrial Pretreatment Program (IPP) that it administers and enforces through its approved sewer use ordinance and IPP permits. The Wixom sewer use ordinance applies to all users of the Wixom sanitary sewer system. The Wixom sewer use ordinance includes the following requirements, which are also incorporated in IPP permits issued by Wixom to industrial users including Tribar:

• Immediate notification by telephone to Wixom of any accidental, nonroutine, or noncustomary batch discharge.

• Prohibition on bypass, which is any intentional diversion of wastewater from any portion of a user's pretreatment system.

### III.   Plea Agreement

Tribar, through an authorized representative, has entered into a plea agreement with the government. The key terms are:

- Tribar pleaded guilty to Count One of the Information.

- Tribar will pay a special assessment of $400.

- The parties agree that a total fine of $200,000 will be paid as follows: $100,000 within 30 days of the entry of the judgment and the remaining $100,000 no later than 12 months after the first payment.

- Tribar will be sentenced to a term of organizational probation for a period of 5 years.

- Within the first 6 months of probation Tribar will adopt and implement an Environmental Management System/Compliance plan. (EMS)

- During the probationary period Tribar will notify the probation Department of any corporate changes that would materially affect the plea agreement and/or the sentence imposed.

- Any newly created or merged company shall be obliged to meet all of Tribar's obligations under the plea agreement.

### IV.   Application of Factors Under 18 U.S.C. § 3553(a)

The sentence proposed by the parties is appropriate considering the factors set forth in 18 U.S.C. § 3553.

7

## A. Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

Tribar's negligence reflected poor training and supervision. And although there is no identifiable harm, there could have been. Tribar's untreated wastewater contained hexavalent chromium, a known carcinogen. Because the POTW discharges to a tributary of the Huron River, Tribar's negligence regarding its wastewater discharges posed a human health risk to downstream drinking water intakes as well as risk to aquatic life in the river.

Tribar inadequately staffed its in-house wastewater treatment plant. It also failed to properly supervise the two operators of the wastewater treatment plant, who were expected to keep the treatment plant operating twenty-four hours a day, between two twelve-hour shifts. When Tribar management was informed of the misfeasance of one of the operators, they failed to take appropriate action.

## B. History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

Tribar has no prior criminal history of which the government is aware.

## V.    Restitution

When the plea agreement was negotiated the parties agreed that there were no identifiable victims. Since then the City of Ann Arbor submitted a request for restitution for costs it incurred after it was notified that an unlawful discharge happened. This request includes the cost of chemicals purchased to treat the water, expert help to treat the water, staffing costs, and lost revenue costs.

Tribar disagrees that the City of Ann Arbor is a victim under the Crime Victim Rights Act. (CVRA) The parties and the City of Ann Arbor all agree that there is no identifiable environmental harm from the release. The government believes that the City of Ann Arbor is a victim under the CVRA as it suffered financial harm, but that restitution should be restricted to costs it incurred immediately after it was notified of the release. Those costs include purchasing chemicals and hiring experts to treat any contamination.

### A. The Harm the City of Ann Arbor Suffered Was Directly and Proximately Caused by Tribar's Offenses.

The CVRA defines a crime victim as "a person directly and proximately harmed as a result of the commission of a federal offense or an offense in the District of Columbia." 18 U.S.C. § 3771. Proximate cause "is a "flexible concept" that generally refers to the basic requirement that…there must be 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Paroline v. United States*, 134 S. Ct. 1710 (2014). "A requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link is so attenuated that the consequence is more aptly described as a fortuity…." *Id*. at 445. As Tribar points out in its Objections to Presentence Report, a person is directly harmed by the commission of a federal offense where that offense is a but-for

cause of the harm.[1]  There is a direct relationship between Tribar's unlawful

release of hexavalent chromium and the City of Ann Arbor's response to address

the threat. The fact that "Tribar Technologies could not foresee that a discharge of

hazardous waste could harm the City at such a distance"[2] is not determinative.

For good reason and in an abundance of caution the City of Ann Arbor

determined that the threat was sufficient to warrant an immediate response. The

Michigan Department of Health and Human Services (MDHHS) determined that

"a no contact order" was necessary to prevent public exposure to Tribar's release

of hexavalent chromium. These decisions and the immediate associated costs were

undertaken with sufficient evidence that a real threat existed.

Victims are entitled to restitution for taking measures to protect themselves.

For example, in *United States v. De La Fuente,* 353 F.3d 766, 768 (9th Cir. 2003),

the indictment charged "mailing threats to injure" where the defendant had mailed

two letters suspected to contain anthrax (but which were later determined not to

contain anthrax). The government sought, and the court ordered, restitution under

the Mandatory Victims Restitution Act (MVRA)[3] for the post office, which opened

---

[1] Tribar Technologies Objections to Presentence Report, p.2 (*In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010) (citation omitted)); *see also In re Fisher* 640 F.3d 645, 648 (citing *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010)).

[2] Tribar Technologies Objections to Presentence Report, p.2-3.

[3] The MVRA has language almost identical to the CVRA in its definition of a victim, diverging only in the types of offenses that may entitle the victim to restitution. The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ."

one of the letters and incurred the costs of evacuation, lost employee work hours, cleanup costs, the hazmat team's response, and testing the letters. *Id.* at 768 and 773.

In *United States v. Brock-Davis*, 504 F.3d 991(9th Cir. 2007), the court held that the motel owner and manager was a victim under the MVRA of the conspiracy and entitled to restitution to cover the costs testing and cleaning required to de-list the room, which the Montana Department of Environmental Quality had listed as a "hazardous meth site."

Even though there is no evidence that hexavalent chromium reached its drinking water intakes, the City of Ann Arbor prudently moved quickly to be able to treat the drinking water immediately if necessary. The City of Ann Arbor had a duty to its citizens to ensure the drinking water was free of hexavalent chromium and that no one encountered contaminated water.

Although the immediate costs of buying chemicals and hiring expert help are proximate and directly caused by Tribar's illegal release of hexavalent chromium, staffing costs and lost revenues may be too attenuated to qualify for restitution under the Mandatory Victims Restitution Act. (MVRA). The government understands that the City of Ann Arbor and Tribar are in discussions to resolve these restitution issues, and if they can resolve the issues before sentencing the government will support that agreement. If the City of Ann Arbor and Tribar do

not reach an agreement the government submits that the City of Ann Arbor is a

victim under the CVRA and is entitled to restitution for the costs of chemicals

purchased and experts hired to help address Tribar's release of hexavalent

chromium.

## Conclusion

For the reasons set forth above, the government requests that this Court

sentence Tribar consistent with the terms set forth in the plea agreement.

Respectfully submitted,

JULIE A. BECK
Acting United States Attorney


 *s/ Karen L. Reynolds*
KAREN L. REYNOLDS  (P31029)
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov


Dated:

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

*s/ Karen L. Reynolds*
KAREN L. REYNOLDS (P31029)
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9672
karen.reynolds@usdoj.gov

N:ereyes\Reynolds, Karen\US v Bravata\MEM Sentencing Memorandum V4.docx